UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-14023-CR-MOORE/LYNCH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

SAMUEL JOSIAH BIGGS,

    Defendant.
_____/

FILED by _____ D.C.

MAY 31 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON
## MOTION TO SUPPRESS DEFENDANT'S STATEMENTS [D.E. #33]

**THIS CAUSE** having come on to be heard upon the aforementioned motion and this Court having reviewed the motion, the government's response, and having conducted an evidentiary hearing on Friday, May 27, 2011, this Court makes the following recommendations to the District Court.

    1.    The sole witness called at this hearing was Agent Brian Ray of Homeland Security. He was called by the government. Agent Ray identified Government's Exhibit No. 1 being the Search Warrant issued by this Court in this case (11-022-FJL). This exhibit was marked as Government's Exhibit No. 1 and admitted into evidence without objection. Government's Exhibit No. 2 was a composite exhibit consisting of three photographs of the interior of the Defendant's home depicting his living room area, dining room area, and bedroom area. This exhibit was admitted into evidence as Government's Exhibit No. 2 without objection. Finally, Government's Exhibit No. 3 is a CD containing the approximate four hour interview of the Defendant. This was admitted as Government's Exhibit No. 3 without objection.

2. Agent Ray identified the Defendant as being the individual he eventually arrested in this case and with whom he conducted the interview in question which is the subject of this motion. The interview took place prior to the Defendant's arrest at the Defendant's home on April 6, 2011. That arrest was the culmination of an investigation that Detective Broughton of the Martin County Sheriff's Office was conducting concerning certain peer-to-peer software users sharing files containing child pornography. During that investigation, Detective Broughton located an IP address which was sharing files which he believed to contain child pornography. The search warrant issued in this case was based upon that investigation.

3. This Court notes for the District Court that Detective Broughton was not at the evidentiary hearing on the Defendant's Motion To Suppress. Agent Ray testified that Detective Broughton was in Chicago and unavailable for this hearing. This Court also points out that this motion was only recently filed and this Court set this evidentiary hearing within one day due to the fact that the District Court has already set this case for trial to begin on Monday, June 6, 2011. In order for this Court to conduct the evidentiary hearing, prepare a Report and Recommendation for the District Court, have that Report and Recommendation ruled upon by the District Court and have all matters ready for trial, there was no other time that this Court could conduct the evidentiary hearing.

4. At the time of the execution of the Search Warrant at about 3:50 p.m. on April 6, 2011, there was no reason to believe nor was there probable cause to believe that this particular Defendant had committed any crimes according to Agent Ray. There was no arrest warrant for the Defendant at that time. Agent Ray and Detective Broughton,

2

together with other officers, were simply going to execute the Search Warrant issued by this Court.

5. As Agent Ray approached the home, he noticed two cars in the driveway of the home where the Defendant resides and where the Defendant was later found. This Court also notes that after checking the internet provider, the IP address associated with the individual whom Detective Broughton believed was sharing child pornography files, was registered to a user at the address in Port St. Lucie, Florida, where the Defendant resided and the address for which the Search Warrant was issued.

6. Agent Ray testified that he knocked on the door and waited approximately fifty seconds to one minute without a response. He then rang the bell and waited another very short period of time with no response. He then knocked again and yelled "Police Search Warrant." There was still no response. The entry team then used a ram to knock in the door and make a forceful entrance into the home.

7. Agent Ray testified that including him, there were a total of eight Homeland Security agents as well as Detective Broughton of the Martin County Sheriff's Office. There were also some marked Port St. Lucie Police units outside the residence which were called there by Agent Ray. However, those officers did not enter the home nor participate in the investigation or search of the residence.

8. As the entry team went through the home, they announced loudly that they were police executing a search warrant and for any occupants to get down. At the time the Defendant was the only occupant of the residence. He was found lying on the floor near the entry to the master bedroom. He was clothed in a t-shirt and boxer shorts.

9. When asked as to the attire that the agents were wearing, Agent Ray testified that Detective Broughton had a shirt and tie on with a badge around his neck. Agent Ray testified that he was wearing khaki pants and a polo shirt with a badge on it. He also had on a raid vest which had the word "Police" on it. The other Homeland Security agents were dressed in a similar fashion as Agent Ray. All of the agents had firearms that were either out and at the low-ready position or holstered. Two agents had long rifles as they entered the home which were later quickly put away once it was determined that the Defendant was the only occupant and that there was no danger to the officers from anyone inside the residence. The agents also had belts on which may have contained canisters of pepper spray and batons. Agent Ray testified that it took approximately one to two minutes to complete the security sweep of the residence.

10. The agents told the Defendant to put his hands behind his back. However, he was not handcuffed at that time. He was only handcuffed when he was finally arrested some four hours later after the interview with Agent Ray and Detective Broughton concluded.

11. Agent Ray testified that he had explained to the Defendant that they were searching for child pornography and the Defendant said that they would not find any at his residence. The Defendant was told that he was not in custody and was free to leave at any time and that they did not have an arrest warrant. The Defendant was told he did not have to talk with them. The Defendant was seated in a chair in the living room. Agent Ray told him that if the Defendant stayed in the residence they would have to "control him" and his movements. This Court would point out at this time that it is relating the substance of Agent Ray's testimony and not the substance from the statements made by anyone during

4

the interview which is contained on Government's Exhibit No. 3. This Court will review that under a separate heading as if that exhibit was a witness.

12. When the Defendant was told to sit in the living room, he was not asked if he wanted any clothes for some thirty minutes. Agent Ray suggested that they move to the adjacent dining room area and he, Detective Broughton, and the Defendant walked over to that area on their own. At no time was the Defendant handcuffed nor physically escorted to anywhere within the residence according to Agent Ray. Agent Ray, Detective Broughton, and the Defendant then sat at the dining room table which is depicted in Government's Exhibit No. 2. Government's Exhibit No. 2 also contains a photograph of a bedroom area with a cabinet containing what appears to be several rifles. None of the firearms were seized during the execution of the search warrant since the firearms were not the subject of the investigation nor the search warrant issued by this Court.

13. Agent Ray noticed the Defendant appeared to be sweating. The Defendant said that he had been sick and had a fever. When asked if he needed medical attention, the Defendant stated he did not need any such medical attention. Agent Ray testified that it did not appear at any time that the Defendant had any difficulty in understanding the questions propounded by he or any of the other agents to the Defendant. Further, Agent Ray had no difficulty in understanding the Defendant's responses to any of the questions nor any of the comments made during the interview. Agent Ray testified that the tenor of the interview was conversational and that there was even some laughing at points during the interview. Agent Ray also made certain that the Defendant did not feel intimated by he or any of the other agents and specifically asked that question of the Defendant. The Defendant responded that he did not feel intimidated.

14. The testimony of Agent Ray reflected that at various times during the interview the house telephone rang. The government's position, when asked by this Court, was that the Defendant did not get up to answer the phone nor even ask if he could answer the phone. However, as this Court commented on the record, since the Defendant had been told that his movements would be "controlled" if he remained in the home, it was perfectly reasonable for this Court to believe that the Defendant did not think that he would be permitted to simply get up during the interview to go answer the telephone. Further, it apparently was a cordless phone and none of the agents brought the phone to the Defendant either. This Court finds that the issue concerning the ringing of the telephone is a "non-issue" in respect to this Court's resolution of the underlying motion. The Defendant may never have asked to answer the phone, but conversely none of the agents brought the phone to the Defendant or told him that he could go answer the phone. This Court is not going to infer anything from the Defendant's conduct nor the conduct of the agents in regards to the ringing telephone.

15. After one of the times that the telephone rang, it was heard to go to voice mail and the Defendant's wife was heard leaving a message. The Defendant was asked by Agent Ray if he wanted to call his wife at that time and the Defendant said no.

16. Defense counsel also pointed out that while Detective Broughton was not able to be present at this hearing, Agent Ray did confirm during his testimony that Detective Broughton is approximately 6'7" tall and in excess of 300 pounds. For whatever that is worth, this Court notes that for the record. However, there is no evidence, as the District Court will see later herein, of any intimidation, force or threats in the record regardless of the size of any of the officers involved in this search and/or interview.

6

17. Early on during the interview, Detective Broughton offered the Defendant something to drink and to get dressed. The Defendant told Detective Broughton where his shorts were in his bedroom and they were brought to the Defendant. He was able to put them on. This appears to have been approximately thirty minutes into the interview according to Agent Ray's testimony.

18. Agent Ray denied that there were any car keys seized from the Defendant. There was an agent who may have asked where the car keys were at a particular time during the interview so that they could be retrieved and the vehicle searched pursuant to the search warrant issued by this Court. However, no car keys were ever seized during the entire time the agents were at the Defendant's residence.

19. Agent Ray testified that neither he nor any other agent told any lies to the Defendant in order to coerce him to make a statement. There were no threats of arrest, no threats of violence, nor any coercion. He testified that no one yelled at the Defendant at any time during the interview.

20. Agent Ray testified that at no time during the interview did the Defendant indicate that he wished to stop talking and leave the residence. He testified that the Defendant would have been allowed to leave the residence if he wanted to do so. As defense counsel pointed out, early on in the interview he would have been in his boxer shorts and t-shirt walking out into the street where he would have been confronted by Port St. Lucie patrol cars and other agents. Nevertheless, Agent Ray testified that the Defendant would have been permitted to leave and it appears as though thirty minutes into the interview the Defendant would have been clothed in his shorts which were retrieved from the bedroom should he have decided to leave.

21. Agent Ray confirmed that no <u>Miranda</u> warnings were read to the Defendant until the end of the interview when it was decided that the Defendant should be arrested. This decision came subsequent to what appears to be the completion of the interview and Agent Ray's conversation with the U. S. Attorney's Office concerning how to proceed with the matter. Agent Ray reiterated during his testimony that prior to being arrested, the Defendant had been advised that he was not under arrest, did not have to answer any questions if he did not want to, and was free to leave.

22. Early on during the interview the Defendant denied downloading any adult or child pornography. During the interview the Defendant was shown some pornography found on the computer and the Defendant stated that he may have downloaded that accidentally. Then further into the interview the Defendant was shown his IP address as it was associated with multiple files available for downloading which contained child pornography. This was approximately three hours into the interview and was the point in time when the Defendant admitted downloading child pornography on the computer. The Defendant was then asked a few questions concerning the settings on his file sharing software where these files were being offered for downloading. Subsequent to answering those questions is the point in time when Agent Ray then contacted the U. S. Attorney's Office to determine whether or not the Defendant should be arrested. Shortly after that conversation was completed, the Defendant was arrested and read his <u>Miranda</u> rights.

23. Some matters which were raised during cross-examination were that once Agent Ray, Detective Broughton and the Defendant moved to the dining room early on in this search, that Agent Ray took his bullet proof vest off. Detective Broughton sat at the dining room table next to the Defendant. At times, Agent Ray would move to the

8

Defendant's other side to show him matters that were being found on his computer. Agent Ray did not recall any other agents being seated at the dining room table during the interview. There was another agent who came in and out to assist Agent Ray with the initial forensic analysis of the Defendant's computer and did happen to speak with the Defendant while in the dining room.

24. Agent Ray admitted that no one asked the Defendant if he wanted to use the bathroom, but the Defendant never asked to do so. It was something that just did not come up during the four hour interview.

25. Agent Ray testified that Detective Broughton did tell the Defendant that they wanted to find out if the Defendant was a threat to children based upon the images that Detective Broughton initially saw during his investigation and which he believed contained child pornography. Agent Ray testified that this was not a lie, but actual reality. He explained further during his testimony that when investigating cases such as this, agents do not know what kind of individual they are dealing with and they need to make certain that the individual is not one that is downloading child pornography and interacting with minors as well.

26. Defense counsel also pointed out that approximately one hour into the interview Agent Ray told the Defendant that they were looking for him to cooperate. Agent Ray explained this statement in that he told the Defendant that because Agent Ray believed the Defendant was not being truthful in what he was telling them up to that point. Agent Ray admitted that at no time did he tell the Defendant that he did not have to cooperate.

27.	Approximately 3 hours and 44 minutes into the interview the Defendant asked for a shirt because he was cold. The Defendant was given a shirt as he requested. It was at this time when the Defendant asked for a shirt that Agent Ray was not in the dining room, but was on the telephone speaking with the U. S. Attorney's Office. Therefore, all of the information that Agent Ray may have received during the interview which he felt was germane to this investigation, had already been obtained. He was on the telephone discussing the options of how to proceed with the U. S. Attorney's Office at that time. This Court would point out that the record is devoid of any other evidence which would suggest that the Defendant made any requests whatsoever for clothing, food, drink, to stop being asked questions, to leave, or any other relevant requests which were not promptly responded to by Agent Ray and the other agents present.

28.	Agent Ray testified that he did not read the Defendant his <u>Miranda</u> warnings until after the U. S. Attorney's Office authorized the Defendant's arrest since Agent Ray did not believe that he had to do so. Agent Ray explained it is his understanding that since the Defendant was not in custody, was free to leave and not answer any questions, that Agent Ray was not obligated to read the <u>Miranda</u> warnings to the Defendant at that time.

## PERTINENT PORTIONS OF THE INTERVIEW CONTAINED ON CD GOVERNMENT'S EXHIBIT NO. 3

29.	This Court has listened to the four hour interview contained on the CD admitted into evidence as Government's Exhibit No. 3. This Court is not going to relate everything which was heard during the interview. In fact, there was a quite a bit of "dead

10

time" on the CD where the recording device is still running, but there are no questions nor responses. During these times it appears to the Court that Agent Ray or the other agents may be looking at the computers and the data being extracted therefrom. However, the Court wants to make it clear that at no time does it appear as though the recording device was turned off during the four hour interview. This Court will simply relate certain pertinent portions of the interview which this Court finds to be relevant to the issues before it in respect to the pending motion.

- -- An agent is heard yelling to "get down." It appears that the Defendant was then on the floor and helped up off the floor once the house was secured.

- -- The Defendant was advised that the agents were executing a search warrant. Agent Ray is heard asking the Defendant whether they would have any problems with him which would require them to handcuff him. The Defendant said no. The Defendant is heard telling Agent Ray that he had been sick all day and was attempting to get to the door when they used the ram to gain entry.

- -- The Defendant is brought into the living room area and Agent Ray explained that they were there to execute a search warrant concerning an investigation of child pornography. The Defendant is heard saying that they would not find any of that there.

- -- Agent Ray is heard telling the Defendant that he is not under arrest and he is free to leave. Agent Ray tells the Defendant that he can choose to talk with them or not. Agent Ray is heard telling the

11

--  Defendant that if the Defendant chooses to stay in the home, they will have to control his location because of the guns that they found in the house. The Defendant also explained that his wife works in Washington, D.C. Monday through Thursday.

--  Agent Ray asked the Defendant if he is o.k. since he was obviously sweating. The Defendant again said that he had been sick. Agent Ray asked if he needed any medical attention and the Defendant said no. The Defendant is asked by Agent Ray if he is comfortable there or would he like to be somewhere else. The Defendant is heard saying that he was o.k.

--  The Defendant is reminded that he did not have to talk with them or answer any particular questions. The Defendant is asked if he would like to talk with them and the Defendant said that he would. The Defendant was then asked about the computer, any passwords and routers.

--  Around this time it appears as though the Defendant and Agent Ray moved to the dining room area of the home. It is at that time that Agent Ray introduces Detective Broughton to the Defendant. Agent Ray specifically asked the Defendant if he felt intimidated by him or any of the agents. The Defendant stated that he was not intimidated.

--  There is discussion on the record about downloading files and file sharing. All of the conversations heard throughout this entire four hour interview appear to be very conversational as were described by

the government in its argument. The Court did not hear any threats, coercion, intimidation, or trickery utilized by any of the agents during the interview. In fact, there were no raised voices by anyone during the entire interview. The only loud yelling was at the very start of the CD when one of the agents is heard going into the home yelling to "get down" to any of the occupants. Thereafter, all of the discussions, questions and answers were in a very calm, conversational tone.

-- At about 2 hours and 35 minutes into the interview, the Defendant is asked by one of the agents where his car keys were. The Defendant gave a couple of different locations where they could be located. There was no further discussion by anyone concerning the car keys.

-- The Defendant was asked about the food collection that he had in his home. He confirmed it was not for any pending tragedy and it was for church members. The Defendant went on to explain why he was collecting food in relation to his church.

-- At about 3 hours into the interview, the Defendant is confronted with child pornography on his computer and Detective Broughton is heard asking if they needed to be concerned about the Defendant in regards to children. The Defendant said that he was just curious as to what was out there in general pornography, but still denied specifically searching for any child pornography. The agents are heard saying that there are some child pornography files downloaded back in 2008. The agents asked the Defendant that once he saw files which were

clearly labeled as child pornography, why did he continue to download them? The Defendant's response was that he still downloaded them because sometimes files were mislabeled as child pornography when they were actually adult pornography.

-- The Defendant is overheard saying that he thought he deleted all of the particular file sharing program including the pornography files that were on his computer. The Defendant did admit that he was curious about older teen girls and mentioned 16 to 18 years of age. The Defendant denied any interest in younger children when specifically asked about 2 year olds or 9 year olds.

-- At about 3 hours and 43 minutes into the interview, the Defendant is heard asking for a shirt off a bar stool in the residence because he was cool sitting there. An agent is heard asking if the Hawaiian shirt would be fine and the Defendant said that would be o.k. It appears as though at this time Agent Ray was on the telephone with the U. S. Attorney's Office as previously indicated in his testimony before the Court at the evidentiary hearing.

-- At about 3 hours and 49 minutes into the interview, Agent Ray is heard coming back to the dining room table and telling the Defendant that he had just talked with the prosecutor and that he was taking the Defendant into custody. The Defendant was then asked to stand up and one can hear the handcuffs being placed on the Defendant. Agent Ray tells the Defendant that he would be taken to the St. Lucie

       County Jail overnight and that he would bring the Defendant to the courthouse in the morning for his initial appearance. There was discussion about getting the Defendant's glasses and whether or not he wanted to leave his ring and any personal property at the residence as opposed to bringing it to jail. Agent Ray is heard asking the Defendant for his phone number.

-- There is also discussion heard from some of the agents about nailing the front door or something over the front door in the area where they made the forced entry. One can overhear the hammering to accomplish that. The Defendant was allowed to get up and go over to see what the agents were doing to the front door area.

-- The interview CD was terminated at approximately 3 hours and 58 minutes. At no time did the Court hear any advice of <u>Miranda</u>.

30.    The Defendant presented no witnesses or evidence at the evidentiary hearing.

## ANALYSIS

31.    The argument of the Defendant is that there were eight agents with guns in his home despite the fact that he was told that he could leave and did not have to talk with anyone, that their mere presence was a sufficiently intimidating factor to make any statements made by him involuntary in light of the failure of Agent Ray, or any other agent, to advise the Defendant of his <u>Miranda</u> warnings prior to conducting the interview in question. Also, counsel for the Defendant argues that even though the Defendant was not

15

handcuffed until he was arrested, he was told that if he stayed in the home he would have to be controlled and his movements controlled. Defense counsel pointed out that even when the phone rang the Defendant obviously did not get up to answer it based upon his fear or being intimidated by the officers. Further, counsel argues that no one advised the Defendant that they were taking the car keys simply to search the vehicles and that it is reasonable for the Defendant to have assumed that the cars and car keys were being seized. Therefore, counsel for the Defendant speculates that the Defendant could then have inferred that he was not free to leave the residence since he did not have a means to leave. However, this is not borne out by the evidence. No one told the Defendant that the car keys nor cars were being seized. It is not for this Court to speculate what was in the Defendant's mind and the Court does not have any evidence before it as to what importance the Defendant may have placed upon hearing the agents ask where the car keys were.

32.  The government argues in response that the audio CD, Government's Exhibit No. 3, is self explanatory. The interview was conversational in nature. The Defendant was told at least twice that he was free to leave, not under arrest, and did not have to answer any questions. The Defendant was also asked if he was comfortable and if he wanted to be somewhere else. The government argues that the totality of the circumstances and evidence clearly reflect the Defendant was not in custody, not intimidated, not threatened, not coerced, and made any statements during the interview of his own free will and accord.

33.  A test in determining whether a defendant is in custody for Miranda purposes is objective. The actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. Because there is no constitutional

16

right to be arrested, a suspect cannot complain that officers postponed arresting him in order to obtain more incriminating statements or other evidence against him. Further, a seizure does not necessarily constitute custody for Miranda purposes. United States v. Street, 472 F.3d 1298 (11th Cir. 2006).

34.     The entitlement to a warning of Miranda rights attaches only when there begins a custodial interrogation. The totality of the circumstances, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of detention is considered. United States v. Luna-Encinas, 603 F.3d 876 (11th Cir. 2010). See also United States v. Ubaldo-Diezca, 398 Fed. Appx. 573 (11th Cir. 2010). Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by the decision in Miranda.

35.     This Court is not going to reiterate all of the evidence since this was a fairly short hearing with only one witness. This Court has done its best to specifically set forth the testimony of Agent Ray as well as the pertinent excerpts from the CD, Government's Exhibit No. 3, in evidence. The length of the interview troubles this Court somewhat in being close to four hours. However, there was some "down time" when there were not questions being asked or answers given. There was a preliminary examination of the forensic computer and data was being collected from that computer and then later shown to the Defendant as the audio recording of the interview indicates. However, this Court cannot find that the length of the interview in and of itself created a custodian situation since the Defendant was sitting at his dining room table in his home.

36. This Court also points out that the record is devoid of any evidence to contradict what this Court has heard from Agent Ray and has heard on the audio recording of the interview. In that regard, the Defendant was advised why the agents were there, that he was free to leave, that he was free to speak with them or not, and he chose to speak with them. The Defendant was not handcuffed, threatened, or coerced in any way based upon the evidence received by this Court. The tone of the interview as reflected by the audio recording was conversational in nature. The interview took place in the mid-afternoon. The Defendant appeared at all times to understand the questions and was able to give appropriate responses to those questions. The Defendant was not under the influence of any drug, medication, or alcoholic beverage of any kind. When asked if he wanted clothes, and he indicated he did, clothes were retrieved for him. When asked if he needed medical attention, the Defendant stated that he did not.

37. Based upon the totality of the circumstances and the evidence before this Court, the Defendant did not appear to be in custody for purposes of <u>Miranda</u> and voluntarily made the statements that he did. While the Defendant speculates through cross-examination and argument that he was prevented from leaving the home since he was in his boxer shorts and may have believed his vehicles had been seized, there is no evidence to support those arguments or speculative beliefs. This Court is bound by the evidence and the evidence does not support those assertions by the Defendant. He was specifically told on more than one occasion that he was free to leave and did not have to speak with the agents present. The Defendant chose to stay and speak with them and there is no evidence to the contrary. See <u>United States v. Smith</u>, 2010 WL 3835229 (S.D. Fla.

2010)(citing United States v. Luna-Encinas, supra and United States v. Hargrove, 625 F.3d 170 (4th Cir. 2010)).

38.     Based upon all of the foregoing, this Court finds that the Defendant's statements were voluntarily made, he was not in custody for Miranda purposes, and that the Defendant's motion should be denied.

39.     As mentioned previously in this Report and Recommendation, the Defendant's motion was only filed on May 24, 2011. This Court immediately set the matter for an evidentiary hearing which was held on May 27, 2011. The case had already been set for trial by Judge Moore for Monday, June 6, 2011. Based upon the short time period, this Court cannot grant the parties the normal fourteen days to file any objections to this Report and Recommendation. Pursuant to Weiss v. Standard Ins. Co., 2009 WL 1833963 (S.D. Fla. 2009) and Grayson v. Cathcart, 2009 WL 4723271 (E.D. N.Y. 2009), this Court will shorten that time period. Based upon the exigent circumstances, this Court will require the parties to file any objections on or before 12:00 noon on Thursday, June 2, 2011.

**ACCORDINGLY**, this Court recommends to the District Court that the Motion To Suppress Defendant's Statements [D.E. #33] be **DENIED**.

The parties shall have **until 12:00 noon on Thursday, June 2, 2011,** within which to file objections, if any, to this Report and Recommendation with the Honorable K. Michael Moore, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** this 31st day of May, 2011, at Fort Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:
Hon. K. Michael Moore
AUSA Russell R. Killinger
Scott I. Suskauer, Esq.